FILED IN CHAMBERS
U.S.D.C. - Atlanta

FEB 0 1 2017

James N. Hatten, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JORGE MATURANO-MARIN A/K/A JORGE MATURANO (1) and CESAR SANTOS-RANGER A/K/A CESAR SANTOS (2) | CRIMINAL CASE NO.<br>1:15-CR-165-ODE-LTW |

ORDER

This criminal case is before the Court on Defendant Cesar Santos' ("Santos") Motion to Suppress Items Seized Without a Warrant [Doc. 28], with Supplemental Brief in Support [Doc. 51] and Second Supplemental Brief in Support [Doc. 75], and Defendant Jorge Maturano's ("Maturano") Motions to Suppress Statements [Doc. 29] and to Suppress Search and Seizure [Doc. 30], with Brief in Support [Doc. 56] and two Supplemental Briefs in Support [Docs. 76, 81]. Also before the Court is Magistrate Judge Linda T. Walker's Report and Recommendation and Order Certifying This Case Read[y] for Trial ("R&R") [Doc. 84], to which both Defendants have filed objections [Docs. 90, 99, 100]. For the reasons stated below, Defendants' motions to suppress [Docs. 28, 29, 30] are DENIED, the R&R [Doc. 84] is ADOPTED IN FULL, and Defendants Objections [Docs. 90, 99, 100] are OVERRULED.

I. **Background**

To the extent that Defendants have not objected to Judge Walker's findings of fact, the following facts are drawn from her R&R [see Doc. 84].

### A. Factual Background

On the evening of May 4, 2015, a confidential informant ("CI") called the main telephone line at the Atlanta Federal Bureau of Investigation ("FBI") office and indicated that he and two other men--Defendants--had recently traveled from Chicago to Atlanta to kill the owner of a restaurant located on Buford Highway. The CI stated that Defendants were attempting to purchase a gun in order to kill the proprietor within the next few days. This CI had worked with the FBI and Drug Enforcement Administration ("DEA") previously in other cities, including Chicago. Following the call, Special Agent Robert McAllister ("McAllister") contacted law enforcement agents in Denver and Chicago who had worked with this CI in the past; these other agents informed Agent McAllister that the CI "was reliable," "had provided reliable information," and "that he was trustworthy."

The CI reported the next day that he and Defendants had been staying at a Motel 6 in Norcross, Georgia, and that they were conducting surveillance of the owner of a bar and restaurant in Duluth in preparation for murdering him (the "Alleged Target") in exchange for $30,000. Defendants and the CI had been to the Alleged Target's restaurant and had followed him to his residence. The CI informed the FBI that Defendants were driving a gray Infiniti, but that "Jorge"--the Chicagoan who had ordered the murder--was sending his nephew, Daniel Rodriguez ("Rodriguez"), to bring Defendants a van and weapons later that day for use during the murder.

The CI sent via text message photos of the Alleged Target, whom the FBI was able to establish is merely an associate of one of the owners of the bar and restaurant in question. The FBI made contact

with him and warned him to stay away from the restaurant and his residence.  Additional investigation and consultation with the DEA led the FBI to determine that the Alleged Target and his associate, the owner of the bar and restaurant, were members of a drug trafficking organization ("DTO") in Georgia, and that the Alleged Target may have left a different DTO in Chicago.  The FBI further concluded that Defendants had been hired by Jorge to kill the Alleged Target because of his decision to leave the Chicago DTO to join the Georgia DTO.

FBI agents set up surveillance at the Motel 6 where Defendants were staying, on Oakbrook Parkway in Norcross, Georgia.  On the evening of May 5, 2015, FBI agents surveilling the Motel 6 saw a white, 2005 Dodge Caravan minivan ("Minivan") enter the parking lot, driven by an individual later identified as Rodriguez.  These agents saw Rodriguez speaking with Defendants and the CI; by text message, the CI confirmed that this Minivan was the one sent down for use during the murder, but that no weapons were as of yet located in the vehicle.

On the morning of May 6, 2015, the CI informed the FBI that Defendants and the CI were to meet with Rodriguez that evening at Graves Park in Norcross, Georgia, so that Rodriguez could provide the guns; FBI agents set up surveillance at Graves Park.  They then followed Defendants, who were driving both the Infiniti and the Minivan, to a location off of Roswell Road near Atlanta.  Defendants left the Infiniti at that location and departed together in the Minivan. Agent McAllister testified that, based upon his experience, Defendants parked the Infiniti at that location so they could switch cars after using the Minivan to murder the Alleged Target; this is

3

apparently a common tactic used to "throw the police off," since the police would "be looking for the car that they committed the crime in."

Also on May 6, 2015, FBI Special Agent Timothy Burke ("Burke") met with the seller of the Minivan, Robert Escobar ("Escobar"). Escobar explained that the Minivan was purchased for $2,300 in cash, and provided a bill of sale and information indicating that Rodriguez purchased the vehicle; he also identified Defendant Maturano as one of the individuals present during the sale.

Later in the day, FBI agents followed Defendants and the CI, who were in the Minivan, to Graves Park, where all three were observed exiting the vehicle. Rodriguez then arrived, stepped out of his vehicle with a bag, and spoke briefly with Defendants and the CI. Rodriguez got into the Minivan with the bag, exited soon after without the bag, and then got into his car and left the park. Defendants and the CI returned to the Minivan and left. The CI then sent a text message to the FBI stating that they had received the guns, Defendant Maturano had inspected them, and the guns were in a bag in the back of the Minivan. The FBI chose to wait to arrest Defendants until they were no longer in possession of these weapons.

Instead, FBI agents arrested Defendants without an arrest warrant when they returned to the Motel 6. Agent McAllister testified that they wanted to effect the arrest when Defendants were unarmed, and also that they wanted to move quickly so as to limit the risk to the Alleged Target. The arresting team entered the motel room with weapons drawn and wearing ballistic vests identifying them as law enforcement. They announced their entrance, handcuffed Defendants and the CI, and secured the room.

4

A few minutes later, Defendants were asked to provide their names and to identify which items in the room belonged to each of them. These items included two black bags, two phones apiece, a wallet and car keys on Defendant Maturano's person, and a second set of keys found elsewhere in the room. The FBI labeled each bag with a Post-It note to indicate which bag belonged to which Defendant. Other agents later conducted an inventory search of each bag, prepared an inventory form, and obtained a search warrant for the phones. The FBI also impounded both vehicles and conducted an inventory search of them.

In the motel room, Special Agent Michael Greene ("Greene") asked both Defendants about their immigration status, allegedly because this was a question that would be asked by booking officers; both Defendants are undocumented immigrants. Defendants spent the night in the Atlanta Detention Center. The next day, Agent Greene and Special Agent Lawrence Guerra ("Guerra"), a native Spanish speaker, attempted to speak with Defendants. Defendant Santos refused, but Defendant Maturano agreed. Agent Guerra spoke with him for ten to fifteen minutes, during which time Agent Guerra explained the charges and questioned Defendant Maturano about his background, place of birth, education, employment, and family. Agent Guerra then read Defendant Maturano his <u>Miranda</u> rights, including the Spanish version; Defendant Maturano gave a taped, two hour interview, the translation of which Agent Guerra has reviewed for accuracy.

**B.   Procedural History**

A criminal complaint issued on May 7, 2015, the day after Defendants were arrested, and on May 12, 2015, a grand jury sitting in the Northern District of Georgia returned a five-count indictment.

Defendants are charged with: (1) conspiracy to commit murder-for-hire and murder-for-hire, in violation of 18 U.S.C. § 1958; (2) possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(I); and (3) possession of a firearm by an illegal alien, in violation of 18 U.S.C. §§ 922(g)(5), 924(a)(2). Defendants were arraigned the same day and held over for trial.

Defendants subsequently filed their motions to suppress as to items taken from the motel room in which they were arrested and the vehicles that they were using [Docs. 28, 29]; Defendant Maturano has also moved to suppress pre- and post-Miranda statements made to law enforcement [Doc. 30]. Judge Walker ordered an evidentiary hearing on August 25, 2015, which was ultimately continued until November 12, 2015 due to issues with the interpreter. FBI Special Agents McAllister, Burke, Greene, and Guerra all testified at this hearing.

After post-hearing briefing from all sides, Judge Walker recommended the following conclusions of law. First, probable cause existed for Defendants' arrest based upon the reliability of the CI and the FBI's independent investigation [Doc. 84 at 20-26]. Second, the search and seizure of personal property from Defendants' motel room was valid under the inventory search exception to the Fourth Amendment's warrant requirement [Id. at 27-37]. Third, the search of Defendants' vehicles was valid under the automobile exception to the Fourth Amendment's warrant requirement [Id. at 37-42]. Fourth, Defendants' motion to suppress their pre-Miranda statements is moot because "the Government represents that it will not introduce either Defendants' pre-Miranda statements regarding their legal status in the United States against them, nor [Defendant] Maturano's pre-Miranda background statements to Agent Guerra" [Id. at 42]. Fifth,

Defendant Maturano "appears to have abandoned any argument that his post-Miranda and post-waiver statements to Agent Guerra should be suppressed" [Id. at 43]. Sixth, and finally, Defendants' statements identifying their personal belongings during their arrest were responsive to administrative questions and not covered by Miranda [Id. at 43-46]. Both Defendants have filed objections to Judge Walker's findings of fact and conclusions of law [see Docs. 90, 99, 100].

## II. Objections to R&R

In reviewing an R&R, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Absent objection, the district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Portions of the R&R to which no specific objection has been made are reviewed for clear error only. See Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) (Story, J.).

Although Defendants take exception to several of Judge Walker's factual findings and legal conclusions, very little actually appears to still be in dispute. First, neither Defendant disputes Judge Walker's conclusion that probable cause existed for their arrest. Second, neither Defendant appears to dispute Judge Walker's conclusion that the search of their vehicles was valid pursuant to the automobile exception to the Fourth Amendment. Third, because the Government has represented that it will not introduce Defendants' pre-Miranda statements as to their legal status, nor Defendant Maturano's pre- or post-Miranda statements, their motions to suppress

on these points are indeed moot [see Docs. 84 at 42, 100 at 5]; this is also not a conclusion disputed by Defendants. A review of Judge Walker's recommendations as to these issues reveals no clear error.

The only remaining issues then are the appropriateness of agents' questions to Defendants about their personal property and the seizure of that property from the motel room subsequent to their arrest. Defendants note that they have "never contended that the subsequent search [of these items] was improper" [Docs. 90 at 11 n.2, 99]. Thus, the Court reviews de novo the remaining points of contention.

**A.   Seizure**

In her R&R, Judge Walker concludes that the seizure of Defendants' possessions within their motel room pursuant to arrest was valid under the inventory search exception to the Fourth Amendment [Doc. 84 at 27]. Defendants object that it is not a search to which they are objecting, but rather an improper seizure of their property [Doc. 90 at 10-11]. They further opine that the agents' testimony in this case indicates that the seizure was for evidentiary purposes and not pursuant to a standard inventory procedure, and that therefore the seizure was unlawful [Id.]. The Court agrees with Judge Walker that the proper analysis is based upon a custody seizure and subsequent inventory search, and that the evidence here indicates that the seizure was proper.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Federal courts have long held that post-arrest searches and seizures for safekeeping and

inventory purposes are reasonable within the meaning of the Fourth Amendment. See Sammons v. Taylor, 967 F.2d 1533, 1539 (11th Cir. 1992); United States v. Gravitt, 484 F.2d 375, 378 (5th Cir. 1973) ("This Court has consistently recognized that the fourth amendment is not violated when the police take custody of the property of persons they arrest to store that property for safekeeping."). While reasonableness is a fact-dependant analysis, see Sammons, 967 F.2d at 1542 (citing United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990)), an impound or custody seizure is generally appropriate so long as the decision is "made on the basis of standard criteria" and "something other than suspicion of evidence of criminal activity." United States v. Foskey, 455 F. App'x 884, 889 (11th Cir. 2012) (citing Sammons, 967 F.2d at 1543)). Nevertheless, "a valid impound and inventory search 'is not vitiated by a[n] . . . officer's suspicion that contraband or other evidence may be found.'" Id. (quoting United States v. Staller, 616 F.2d 1284, 1290 (5th Cir. 1980)).

    The Court is satisfied that the Government has met its burden. Agent Burke testified that Defendants' property would probably have been seized as "instruments of the crime," but that it is general practice and procedure to collect personal items from a motel room when an arrest is effectuated [Doc. 48 at 74:20-75:8]. Agents conduct such a seizure because "honestly, in a motel room like that, if we don't take everything, then it is just going to be taken by somebody else." [Id. at 74:21-23]. Agent Greene also testified that one of his jobs in the motel room was to figure out whose property was whose "because we didn't want to leave it in the hotel room because it would have been confiscated by the hotel personnel." [Id.

9

at 90:21-91:1]. He further testified that this was common practice: "[I]n a hotel room, we usually don't leave property in a hotel room because it will be thrown away. So, we want to take that property with us." [Id. at 92:21-24].

Defendants attempt to make much of Agent Burke's inability to "recite verbatim" the FBI's policy on personal property that is seized and his statement that collecting evidence or instruments of a crime is one basis for seizing personal property [Id. at 81:5-10]. However, belief that evidence of a crime may be found does not by itself invalidate a custodial seizure. See Foskey, 455 F. App'x at 889 (citing Staller, 616 F.2d at 1290). Furthermore, the purpose of custodial seizure is exactly as testified to by Agents Burke and Greene--namely, to prevent destruction of an arrested individual's personal property and forestall accusations of theft. See Gravitt, 484 F.2d at 378 (citing United States v. Lipscomb, 435 F.2d 795, 800 (5th Cir. 1971)).

It thus appears to the Court that there is a standard practice among FBI agents of seizing the personal property of an individual arrested in a hotel or motel room for safekeeping, whether or not they also possess an investigatory motive. The Government has met its burden of proof, and Defendants' motion to suppress on this point is therefore denied.

### B.  Ownership Questions

In her R&R, Judge Walker relied heavily on United States v. Gaston, 357 F.3d 77 (D.C. Cir. 2004), to conclude that questions posed to Defendants as to whose property was whose were appropriate "administrative questions" [Doc. 84 at 46]. Only Defendant Maturano expressly objects to this finding, arguing that these were

investigative questions likely to elicit an incriminating response [Doc. 100 at 3]. In particular, because the FBI's CI had provided telephone numbers associated with the two individuals with whom he was traveling, Defendant Maturano argues that agents had an "expressed interest in obtaining the information sought for the purpose of prosecuting Mr. Maturano for a criminal offense" [Id. at 4]. The Court agrees with Judge Walker that the agents were asking administrative questions necessary to do their job.

The Fifth Amendment to the United States Constitution guarantees that no "person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held that a person must be warned of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), whenever subject to custodial interrogation, including words or action "that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Nevertheless, "though the Fifth Amendment's protection against self-incrimination is not, as a general rule, governed by a reasonableness standard, the Court has held that 'questions . . . reasonably related to the police's administrative concerns . . . fall outside the protections of Miranda.'" Maryland v. King, 133 S. Ct. 1958, 1975 (2013) (quoting Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990)).

As analyzed above, custodial seizure and subsequent inventory search of an arrestee's personal items is a reasonable and commonly accepted administrative action, one which FBI agents particularly take when an arrest occurs in a hotel or motel room. See Gravitt, 484 F.2d at 379 ("[T]he police have a legitimate interest in separating the accused from the property found in his possession. An

inventory is then necessary . . . .") (citing Lipscomb, 435 F.2d at 800). The Court thus agrees with Judge Walker that to properly effect such a seizure, it is necessary to ascertain whose property belongs to whom. See United States v. Toumasian, No. 1:10-cr-291-TCB-3, 2011 WL 3738980, at *4 (N.D. Ga. Aug. 22, 2011) (Batten, J.) (applying Gaston, 357 F.3d at 82 (extending the "booking questions" Miranda exception to an arrestee's "address and ownership interest in the house" in which he was arrested as a similar "administrative" or "record-keeping" concern)). The Court does not agree with Defendant Maturano that these questions were likely to produce an incriminating response; the agents simply needed a name to put on the Post-It that they placed on the bags properly seized pursuant to his arrest. Defendant Maturano's motion to suppress on this point is therefore denied.

### III. Conclusion

For the reasons stated above, Defendants' objections to the R&R [Docs. 90, 99, 100] are OVERRULED. The R&R [Doc. 84] is ADOPTED IN FULL. Defendants' Motions to Suppress [Docs. 28, 29, 30] are DENIED.

SO ORDERED this ___1___ day of February, 2017.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE